IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:18-CR-00601 |
| | § | |
| CLARENCE TRAMIEL BEARD | § | |

## <u>ORDER ON MOTION TO SUPPRESS</u>

### I.    Introduction

This matter came before the Court for hearing on the Motion to Suppress filed by the Defendant Clarence Tramiel Beard ("Beard" or "Defendant"). [ECF No. 24]. The Government filed its opposition [ECF No. 25], and Defendant filed a reply to the Government's response. [ECF No. 28]. The Court has reviewed the Parties' briefings and arguments presented at the hearing, as well as the Parties' supplemental post-hearing briefing. [ECF Nos. 37, 38].

### II.    Background

This case involves a mailed package searched by government agents. On November 27, 2017, a United States Postal Inspector named Jeff Gordon ("Gordon") placed a parcel watch on 43482 Little Vegas Dr., Hammond, LA 70403, an address that had been implicated in numerous monetary transactions involving a narcotics trafficking suspect. At the time, Gordon knew the following facts: (1) Beard was suspected of trafficking in narcotics using the mail system, (2) Homeland Security Investigations ("HSI") had an ongoing investigation into Beard, (3) Beard used the alias "Nick Johnson" on prior occasions, (4) numerous structured payments in $1,000 increments had been sent via wire transfers from the Hammond address to Beard, and (5) the Hammond address was valid and associated with an individual named Kelly McAllister ("McAllister"). [ECF No. 35 at 8–9]. In particular, Gordon testified that through the HSI

investigation, several individuals had been arrested for drug possession in Amarillo and that Beard had been identified as the individual who had supplied them with packages of drugs through the mail. [*Id.* at 9].

On January 8, 2018, Gordon was alerted to a priority mail parcel destined to the Hammond address. The alert was automatically generated and included an image sent to Gordon of the mailing label and package, but the automated system could not intercept the package. [*See id.* at 15]. Gordon testified that the automated alert system is not capable of pulling a package from the mail stream. He also testified that although the package was still in Houston on that date, that it was located in a shipping warehouse in Houston that contains large quantities of mail. He stated that postal inspectors have not successfully requested that packages be retrieved or returned from that warehouse, and that he did not know of any way to stop the package prior to its being mailed to Hammond, Louisiana. [*See* ECF No. 35 at 38–39, 54]. As a result, the package continued on its way to Hammond and was in transit from Monday, January 8, 2018 through Thursday, January 11, 2018 when it arrived in Hammond.

According to Gordon, the package had handwritten labels identifying the return address as Nick Johnson at 3746 Ashford, Houston, Texas. He testified at the hearing that the package was sent from a post office that Beard was known to frequent, that it included the known Nick Johnson alias, and that the return address was not a valid address.[1] Gordon testified that the return address was not only incomplete, but it was also a false address. He also explained under oath that this address was notable because Beard's prior address was 3742 East Ashford Villa, and that in Gordon's experience, individuals often use old addresses or slight variations of them to avoid

---

[1] Gordon testified on cross-examination that he did not search for iterations of street names including "Ashford" in Houston, Texas, such as an Ashford Place, Ashford Street, Ashford Avenue, or Ashford Lane that might house a 3746 Ashford address. [*See* ECF No. 35 at 49].

detection. [*Id.* at 55–56]. Further, Gordon testified that at the time the package was mailed, law enforcement knew that Beard no longer lived on "Ashford anything" or an address including the word "Ashford." [*Id.* at 56–57].

Gordon requested on January 8, 2018 that the package be shipped back to him in Houston once it arrived to the post office in Hammond.[2] When the package arrived in Hammond, Gordon testified that it was "pulled in the post office prior to being delivered to the recipient address and was shipped on Friday, January 12, 2018 back to Gordon in Houston. He testified that postal workers in Hammond left the parcel intact and placed it in another larger box, which was addressed to Gordon. According to his testimony, packages sent in this manner to postal inspectors are typically sent via Express Mail, but he did not know if this package was actually mailed as such. He testified that it displayed no labels designating that it was being shipped for law enforcement purposes. He further averred that he had no way to request that the package be overnighted or otherwise expedited. [ECF No. 35 at 18–19].

The package remained in transit from Friday, January 12 until the afternoon of Wednesday, January 17, 2018 when Gordon received it in Houston. At that time, Gordon examined the box in person but did not open it. He testified that the weight of the package was consistent with other known packages of narcotics, in that it contained two separate dense center masses that sounded and felt soft when they touched the sides of the parcel. At this point, Gordon believed the parcel to contain bags of some type of powder. [ECF No. 35 at 21].

---

[2] Gordon testified that he requested that the package be sent back to Houston rather than examined in Hammond for the following reasons: "[A]t the time []postal inspection and Homeland Security Investigations had a deliberately established relationship with the Customs and Border Protection lab here which gave us the opportunity to basically have priority in getting boxes in that were suspected of having opioids and other derivatives of it. At that time no one had -- those kind of drugs were not testable in the field, so if we would have had -- even if we would have had somebody open the box in Hammond, they would still have to send the box to us for -- to get it tested." [ECF No. 35 at 26–27].

On the morning of January 18, 2018—"first thing the next morning"—Gordon secured a canine unit to conduct a sniff test of the parcel. [*Id.*]. Gordon testified that the canine unit consisted of Officer Corrales, the handler for canine "Gero." Gordon attested that he had previously worked with this team and knew the dog's name to be "Gero." Gordon was not present in the room when Corrales conducted the sniff test with "Gero," but stated his understanding that Corrales had presented "Gero" with three boxes, including the parcel of interest and two decoys, and "Gero" alerted to the presence of narcotics in the parcel. [*Id.* at 22–23, 33]. Gordon also testified that he had worked with a dog named "Enzo" previously and recognized that the canine officer used on January 18, 2018 was in fact "Gero," not "Enzo." [*Id.* at 23].

Gordon further testified that he then prepared an application for a search warrant, which was reviewed by an Assistant United States Attorney ("AUSA"), and which was then approved by a United States Magistrate Judge. He testified that, as with other affidavits prepared during his tenure at the Postal Inspectors office, he used a template and the "cut-and-paste" function in preparing the document in a computer word processor. In preparing the affidavits, Gordon avers that he reviewed all the paragraphs to ensure that the information reflected the facts of this investigation, but that he (along with the AUSA and Magistrate Judge) missed the "typo" in one sentence of Paragraph 6, where he mistakenly stated that a canine named "Enzo," rather than "Gero," alerted to the package. [*See* ECF No. 35 at 30].

Gordon and HSI Agent Therese Renick ("Renick") executed the search warrant on the same date, January 19, 2018, and discovered two socks in the parcel. One sock contained a Ziplock bag filled with approximately 599 Xanax pills and the other with approximately 500 pills containing fentanyl. On October 3, 2018, a federal grand jury returned a one-count indictment

charging Beard with possession with intent to distribute a controlled substance (fentanyl). Laboratory tests indicated that the substances were alprazolam and methoxyacetyl fentanyl.

Beard has now moved to suppress the contents of the parcel. [ECF No. 24]. Beard argues: (1) that the parcel was seized in violation of the Fourth Amendment because Gordon had no reasonable suspicion that the package contained drugs; (2) that the delay between the actual seizure and obtaining a search warrant rendered the seizure and subsequent warrant-based search invalid; (3) that the warrant itself was invalid because it contained falsehoods that were material to establishing probable cause; (4) that the search warrant was nothing more than a barebones affidavit lacking probable cause; and (5) that the good faith exception should not apply. [*Id.*].

In return, the Government argues that the initial seizure of the parcel was predicated upon adequate reasonable suspicion, that the delay was reasonable and unforeseen, that the warrant was based upon sufficient probable cause, that any mistakes were merely typographical errors that cannot negate probable cause, and that even if the warrant was invalid, the good faith exception should apply. In addition, the Government challenges Beard's standing to file the suppression motion. [*See* ECF No. 25].

Having considered the Parties' arguments, testimony, submissions, and the relevant facts and law, the Court will address the issues in turn.

### III. Analysis

#### A. Standing

"Individuals do not surrender their expectations of privacy in closed containers when they send them by mail or common carrier." *United States v. Villarreal*, 963 F.2d 770, 773–74 (5th Cir. 1992); *United States v. Jacobsen*, 466 U.S. 109 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy.").

As such, "[b]oth senders and addressees of packages or other closed containers can reasonably expect that the government will not open them." *Villarreal*, 963 F.2d at 774 (citing *United States v. Jacobsen*, 683 F.2d 296, 298 n.2 (8th Cir.1982), *rev'd on other grounds*, 466 U.S. 109 (1984)). Therefore, even when government agents have probable cause to believe a package contains contraband, they generally cannot search it without first obtaining a warrant, unless some exception to the warrant requirement applies. *Id.*; *see also United States v. Van Leeuwen*, 397 U.S. 249, 250–53 (1970).

The Government challenges whether Beard has standing to pursue this motion to suppress, arguing that because Beard used an alias when sending the parcel, that he no longer possesses a reasonable expectation of privacy under the Fourth Amendment for its contents.

The Fifth Circuit, however, has held in similar cases that use of a fictional name does not dispel a defendant's legitimate expectation of privacy. *Villarreal*, 963 F.2d at 774 ("Although the consignee of the [package] was technically a fictitious person named Roland Martin, this court has made clear that individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names); *see also United States v. Richards*, 638 F.2d 765, 770 (5th Cir. 1981); *United States v. Pierce*, 959 F.2d 1297, 1303 n.11 (5th Cir. 1992).

Further, Gordon established in his testimony that Beard used the alias Nick Johnson for prior mailings and that the law enforcement agents knew that Beard was the one who mailed the parcel in question. [*See* ECF No. 35 at 62–63]. Although Beard did not testify as to the nature or reason for his expectation of privacy in the parcel—indeed, Beard did not testify at all—the Court is satisfied that Beard had a reasonable expectation of privacy in the parcel and that he has standing to contest the search, which were adequately established through Gordon's testimony.

## B. Length of the Delay Prior to Establishing Probable Cause

Beard contends that the postal authorities detained the parcel for an unreasonably long period while investigating. As a result, Beard argues that the delay lasted long enough to require probable cause rather than only reasonable suspicion. He argues that because the Government lacked probable cause for the initial seizure, it was invalid.

In *United States v. Van Leeuwen*, the Supreme Court stated that an individual has a Fourth Amendment right to be free from unreasonable searches and seizures of items they place in the mail. 397 U.S. 249, 251 (1970). "However, upon reasonable suspicion that the package contains contraband, law enforcement authorities may detain the package for a reasonable length of time while investigating the package." *United States v. Evans*, 282 F.3d 451, 454 (7th Cir. 2002) (citing *Van Leeuwen*, 397 U.S. at 252–53). In determining whether the length of time for the detention was reasonable, courts face a fact-specific inquiry. In reviewing *Van Leeuwen*, several circuits have found that even where the initial seizure is valid, continued detention could at some point become an unreasonable seizure. *See United States v. Aldaz*, 921 F.2d 227, 229 (9th Cir. 1990); *Evans*, 282 F.3d at 455 ("[A]t some point in time, a detention of mail extends from a stop to a seizure requiring probable cause . . . .").

The Court must first determine whether Gordon had adequate reasonable suspicion to detain the parcel in question. The evidence shows that prior to requesting that the parcel be pulled from the mail stream, Gordon knew or believed that:

- Beard was suspected for trafficking in narcotics through the mail;
- HSI had an ongoing investigation into Beard;
- Through the HSI investigation, several individuals had been arrested for drug possession in Amarillo who had identified Beard as the individual who supplied them with drugs through the mail;
- Beard had used the alias "Nick Johnson" on prior occasions;
- Several structured payments in $1,000 increments had been sent from the Hammond address to Beard;

- The Hammond address was valid and associated with McAllister;
- The parcel in question had a handwritten label;
- The parcel was sent from a post office that Beard was known to frequent;
- The parcel was sent from "Nick Johnson";
- The parcel listed an incomplete and false return address ("3746 Ashford, Houston, Texas") which was a slight variation of one of Beard's previous addresses ("3742 East Ashford Villa"); and
- In Gordon's experience, individuals trafficking in narcotics sometimes use old addresses or slight variations of them to avoid detection.

[ECF No. 35 at 8–9, 55–57]. The Court finds that Gordon had reasonable suspicion to detain the parcel in order to investigate it.

The Court turns, therefore, to whether the delay between when Gordon requested that the parcel be returned to him in Houston (January 8) and when it actually arrived (January 17) was unreasonably long and thus required a heightened finding of probable cause. The Court initially notes that the package was not seized until January 11, 2018 when it was pulled from the normal stream of mail into which Beard had placed it. As Gordon testified, his expectation was for the box to be returned to him "within a day or two." [ECF No. 35 at 37]. He explained that the delay while the parcel was being shipped back to him was unexpected and unavoidable as a result of slow mail service rather than lack of diligence on the part of government investigators. Further, Gordon testified that even if the parcel was examined by dog sniff in Hammond, it still would have been returned to Houston for testing. [ECF No. 35 at 26–27]. As a result, Gordon's testimony suggests that while the delay was longer than anticipated, his actions were not dilatory.

When looking at circumstances where courts have found delays to be unreasonably long, courts have frequently looked at both the behavior of the officers and extenuating circumstances that might justify the delay. *See Evans*, 282 F.2d at 455 ("Brevity of a detention is an important factor in determining whether it may be justified by reasonable suspicion only . . . . [W]e also consider whether the police diligently pursued their investigation."); *United States v. Fulton*, 914

F.3d 390, 398 (5th Cir. 2019) (considering length of the delay along with police diligence and zeal as factors in the reasonableness of a nine-day delay).

The Court examines the reasonableness of the delay here by assessing the reasonableness of its components: (1) the time taken transporting the package from Houston to Hammond back to Houston; (2) the time between arrival of the package and the dog sniff; and (3) the time between the dog sniff and the execution of the search warrant. *See Aldaz*, 921 F.2d at 230.

First, the delay while the parcel was shipped from Houston to Hammond and returned to Houston, although spanning multiple days, was not unreasonably long. Moreover, the delay was not the "fault" of law enforcement. Gordon testified that when he requested that the package be pulled from the mail stream, it was located in a shipping warehouse from which the postal inspectors had never successfully requested that the parcel be pulled. From there, it appears that the parcel took three days in transit from Houston to Hammond where it was "seized," as that term is understood in law. Then, it took another five days in transit returning from Hammond to Houston—allegedly via express mail. While the Court occasionally finds the slow speed of ground mail to be vexing (and perhaps the reason it is now termed "snail mail"), it does note that this return was over a weekend and that it did not involve any lack of diligence on behalf of law enforcement. Gordon testified that he followed normal procedures and expected the parcel would be returned within one to two days, rather than the five days it actually took to travel from Hammond to Houston. Once it arrived in Houston, law enforcement acted quickly.

The finding is consistent with those from courts around the country. For example, courts have found delays of several days to be reasonable where the circumstances suggested that law enforcement acted with diligence despite extenuating circumstances. *See Aldaz*, 921 F.2d at 231 (finding that a five-day delay was reasonable because of constraints in quickly transporting the

packages between remote Alaskan communities); *United States v. Gill*, 280 F.3d 923, 929 (9th Cir. 2002) (finding that a six-day delay was reasonable where the officers spent the intervening time conducting further investigations to establish probable cause and encountered administrative delays with the magistrate judge).

Additionally, the Fifth Circuit has recently addressed the concept of reasonable delays in a similar case involving different types of items to be searched. In *United States v. Fulton*, police seized a cell phone in the process of executing a previously obtained search warrant. 914 F.3d at 397. Since the first warrant did not identify any specific electronics, the officers lacked authorization to search the contents of the phone and needed to apply for a second, more specific search warrant. The officers waited for nine days while the phone sat in evidence before applying for the second search warrant. The Fifth Circuit held that although the police did not act with urgency, the delay was not "the result of complete abdication of [the officer's] work or failure to see any urgency." *Id.* at 398 ("We conclude that a nine-day delay before acquiring a search warrant in this case, reflecting some attentiveness but not zeal by police, was reasonable.").

In contrast, courts have found delays to be unreasonably long where law enforcement acted without sufficient urgency and without sufficient justifications for their delays. *See United States v. Mitchell*, 565 F.2d 1347, 1351 (11th Cir. 2009) (finding a twenty-one-day delay in applying for a search warrant after seizing the hard drive to be searched was unreasonable where the agent had it in his possession for several days and did nothing before leaving for a two-week training program); *United States v. Dass*, 849 F.2d 414, 415 (9th Cir. 1988) (finding the government's delays in seeking warrants to be unreasonable where law enforcement waited between seven and twenty-three days after conducting dog sniffs to seek search warrants for the packages to which the dogs alerted).

The facts here do not reflect similar intransigence or inattentiveness to the ongoing investigation. The Court declines to find that the length of time it takes to ship a package through the United States Postal Service can derail an otherwise reasonable investigation. For a postal inspector to ask that a mailed package be mailed back is neither negligence nor unreasonable conduct.

Second, the time between Gordon's receipt of the parcel and its submission to a canine drug sniff was not an unreasonably long delay. Gordon received the package in the afternoon and could not arrange a drug sniff until the following morning, which he testified was the first available time. [ECF No. 35 at 21]. These facts resemble the delay in *Aldaz*, where the inspector received the package in question at the end of the workday and had to wait overnight to arrange a drug sniff, 921 F.2d at 231, and those in *Van Leeuwen*, where Seattle Customs had to wait until the next morning for information about a question in Tennessee because of the time zone difference between offices. 397 U.S. at 252–53.

Third, the time that elapsed between the dog sniff and execution of the search warrant does not constitute an unreasonable delay. Although the warrant was executed on the following day, the testimony shows that much of the preceding day when the drug sniff occurred was consumed by administering the drug sniff and completing and reviewing the application for the search warrant. *See Aldaz*, 921 F.2d at 231.

After examining the applicable law, both from this circuit and other federal courts, this Court finds that while the delay was somewhat lengthier than anyone anticipated due to the mail service, it was not unreasonable and did not rise to the level necessitating a finding of probable cause.

### C. Applicability of the Good-Faith Exception

Beard also contests the validity of the search warrant and the affidavit upon which it was based. "The bulwark of Fourth Amendment protection" is its requirement that "police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation." U.S. Const. amend. IV. "Evidence obtained in violation of the Fourth Amendment is to be excluded in a criminal proceeding against the victim of the violation." *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002) (citing *United States v. Calandra*, 414 U.S. 338, 347 (1974)).

When considering the validity of a search warrant, the Fifth Circuit has employed a two-step inquiry: First, the court determines whether the good-faith exception to the exclusionary rule applies. *See United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999). If the good-faith exception does not apply, the court proceeds to determine whether the magistrate had a substantial basis for finding probable cause. *See id.* at 407; *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1129 (5th Cir. 1997).

In the instant case, therefore, the Court must first determine whether the investigator's good faith reliance on the warrant would, the asserted Fourth Amendment violations notwithstanding, make suppression of the evidence an inappropriate remedy. *See United States v. Leon*, 468 U.S. 897, 922–23 (1984); *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992). "Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the probable cause issue if . . . the good-faith exception of *Leon* will resolve the matter." *United States v. Craig*, 861 F.2d 818, 820 (5th Cir. 1988).

The good-faith exception to the exclusionary rule provides "that evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance upon a search warrant is admissible in the prosecution's case-in-chief, even though the affidavit on which the warrant was based was insufficient to establish probable cause." *United States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997) (citing *Craig*, 861 F.2d at 821). It also bears noting that the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Leon*, 468 U.S. 897, 906 (1984). In other words, whether Beard's Fourth Amendment rights were violated is a different inquiry from whether the exclusionary rule should apply in the instant case. *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005). "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916. As the Fifth Circuit has explained: "[W]hen an officer executes a warrant *in good faith*, the deterrent effect of the exclusionary rule on that officer does not trump the costs of suppressing reliable physical evidence, even if the search is subsequently found violative of the Fourth Amendment." *Gibbs*, 421 F.3d at 357 (emphasis in original).

The good-faith exception only applies, however, where the executing officer's reliance on the issuing-judge's probable cause determination and the technical sufficiency of the warrant was objectively reasonable. *See Leon*, 468 U.S. at 922. Courts therefore will uphold an officer's good-faith reliance on an otherwise deficient warrant unless one of the following scenarios apply: (1) the issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the issuing judge "wholly abandoned his judicial role" in such a manner that "no reasonably well trained officer should rely on the warrant"; (3) the underlying affidavit is "bare bones" or "so lacking in indicia

of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.* at 923.

Here, Beard contends that the good faith exception does not apply under both the first and third factors, that is, that the affiant for the underlying affidavit recklessly disregarded the factual inaccuracies of his statements and that the affidavit is also "bare bones" and therefore invalid. The Court will address each of these arguments in turn.

    *i.*    *Alleged False Statements in the Warrant Application*

Beard argues that his motion to suppress should be granted because the underlying affidavit contained false statements, and once those statements are disregarded, the affidavit's remaining content is insufficient to establish probable cause. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *United States v. Ortega*, 854 F.3d 818, 825 (5th Cir. 2017). For support he points to the description of the dog as "Enzo" instead of "Gero." Although Beard argues that any false statements, including those made by typographical error, must be disregarded, the applicable case law differentiates between false statements based on the *mens rea* of the affiant. Under *Franks*, "a search warrant must be voided if the defendant shows by a preponderance of the evidence that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause." *Ortega*, 854 F.3d at 826; *see also United States v. Alvarez*, 127 F.3d 372, 373–74 (5th Cir. 1997) ("If a search warrant contains a false, material statement made intentionally or with reckless disregard for the truth, the reviewing court must excise the offensive language from the affidavit and determine whether the remaining portion establishes probable cause."). The Supreme Court has described its holding in *Franks* as a case

concerning false information provided by the police: "Under *Franks*, negligent police miscommunications in the course of acquiring a warrant do not provide a basis to rescind a warrant and render a search or arrest invalid." *Herring v. United States*, 555 U.S. 135, 145 (2009).

The *Franks* inquiry before the Court therefore includes three questions: First, does Gordon's affidavit contain a material false statement? Second, was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in Gordon's affidavit fail to establish probable cause? *See Ortega*, 854 F.3d at 826. If the answer to the first two questions is "yes," then the Court must determine the answer to question three.

Beard specifically challenges the truthfulness of the last sentence of the paragraph in Gordon's affidavit, which appears as follows:

> . . . On January 18, 2018, the Subject Parcel was exposed to narcotics detection canine "Gero" at the Inspection Service's Houston Division Headquarters located at 4600 Aldine Bender Rd., Houston, TX 77315. "Gero" is handled by R. Corrales, Canine Officer with the Houston Police Department. Officer Corrales and "Gero" are certified as a team in the detection of controlled substances. "Gero" has numerous hours of training in the detection of controlled substances, such as marijuana, cocaine, methamphetamine, heroin, and MDMA. "Gero" has successfully alerted on concealed controlled substances in numerous prior cases, which have led to the arrests of numerous suspects for narcotics violations. The subject parcel was placed inside Room 134 at the Postal Inspection Service building with two (2) inert "decoy" boxes. "Gero" conducted an on-leash search of the area. *According to Officer Corrales,[3] "Enzo" positively alerted to the presence of the odor of a controlled substance within the Subject Parcel at approximately 9:19 am.*

[ECF No. 25-1 ¶ 8] (emphasis added). In the paragraph, Gordon referred to the canine officer as "Gero" five out of six times that the dog was identified. "Gero" was in fact the canine involved in this matter. The operative sentence, however, where it describes that fact that the canine alerted to a substance, is a false statement in that no canine officer named "Enzo" was involved in this

---

[3] During his testimony, Gordon testified that he was not present for the dog sniff and included the information in his affidavit as reported to him by Officer Corrales.

investigation. The canine that alerted was "Gero." If that sentence is excised, the affidavit no longer contains a hit on the dog sniff, and as the Parties agree, the "lynchpin" of probable cause in this case disappears. Beard does not argue that Gordon intentionally referred to "Enzo" to mislead the issuing judge; however, he does argue that Gordon acted with reckless disregard of the truth. In response, the Government argues that the reference to Enzo was a simple typographical error. The Court agrees with the Parties' assessment that the sentence in question contains a technically false, material statement that, if made intentionally or with reckless disregard of the truth, would need to be excised from the affidavit.

The Court then turns to whether Gordon made the false statement—that "Enzo" rather than "Gero" alerted—intentionally or with reckless disregard for the truth. Gordon testified during the suppression hearing that he used a template when preparing these affidavits, in which he inserted investigation-specific information. For example, Gordon testified that he edited the sentence in question to accurately reflect that the canine positively alerted at 9:19 a.m. He also testified that he revised all of the preceding sentences in the paragraph in question to reflect which dog conducted the sniff ("Gero"), which officer he worked with (Corrales), and what training "Gero" had completed ("numerous hours of training in the detection of controlled substances, such as marijuana, cocaine, methamphetamine, heroin, and MDMA"). Gordon testified that the only error in the paragraph was the name of the dog included in that final sentence. He failed to correct the template in that sentence to reflect the accurate name of the dog. Gordon also averred that neither he nor the reviewing AUSA noticed the error when they proofread the document prior to submitting the affidavit to the magistrate judge who granted the warrant.

The Court, therefore, must evaluate the circumstances surrounding the preparation of the affidavit and the inclusion of the misstatement, as well as applicable precedent to determine the applicable guidelines set out by the Supreme Court and the Fifth Circuit in similar circumstances.

The Supreme Court has noted that:

> [A]ffidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation . . . .This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the underlying circumstances upon which that belief is based . . . Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.

*United States v. Ventresca*, 380 U.S. 102, 108–09 (1965).

In considering whether the drafting of an affidavit involved reckless disregard of the truth, the Fifth Circuit has consistently considered both the materiality of the false statement as well as the context in which the affidavit was drafted. *See Alvarez*, 127 F.3d at 374. For example, in *United States v. Namer*, the Fifth Circuit found that a misstatement in an underlying affidavit for a search warrant related to securities fraud was made in reckless disregard for the truth. 680 F.2d 1088 (5th Cir. 1982). The Court noted first that the material misstatement manipulated the facts and was the only statement in the affidavit tending to establish that the defendant acted criminally. *Id.* at 1094. Second, the Court emphasized that the affidavit was "drafted by two attorneys during the course of a lengthy investigation at a time when they were not beset by any exigent circumstances." *Id.*

In another case, the Fifth Circuit found a statement in an underlying affidavit to be material and false where the officer used a specific legal term from the criminal statute to describe the suspect's actions, despite the fact that his actions did not fall within specific definitions of the

alleged crime as defined in the statute. *Alvarez*, 127 F.3d at 374. The officer's representations "may have left the impression that he had checked with an attorney who was familiar with the legal definition" of the crime alleged, "when that was not the case." *Id.* at 375. In finding reckless disregard, the Court emphasized three factors: the officer's lengthy experience in law enforcement, his lack of consultation with any attorney and the representation that he had actually consulted with one, and the fact that there was no exigent circumstance that could have prevented the officer from carefully setting out the facts in his affidavit. *Id.*; *see also United States v. Neal*, 182 F. App'x 366, 370–71 (summarizing *Alvarez* factors as including "exigency, the materiality of the misrepresentation, the officer's level of training, non-disclosure of facts underlying conclusory statements, and whether the officer consulted with an attorney").

Several other cases from the Fifth Circuit provide examples against which to compare Gordon's affidavit. In *United States v. Neal*, the Fifth Circuit affirmed a finding that the officer's misrepresentations were a simply a matter of "draftsmanship." *Id.* at 370. In that case, the officer wrote in his affidavit that he received information from a particular witness, when in fact he never spoke to that witness. *Id.* at 368. The court emphasized that the officer "was pressed for time, as he was handling multiple interrogations and multiple warrant applications" and that his misrepresentation was "immaterial to the magistrate judge's finding of probable cause." *Id.* at 371.

In *United States v. Gallegos*, an officer completing a warrant application misstated the identity of who was in control of a house that was suspected in ongoing methamphetamine deals and stated that drugs were dealt "at" the residence rather than "outside" it. 239 F. App'x 890, 894–95 (5th Cir. 2007). Rather than looking at the circumstances under which the officer drafted the affidavit, the Fifth Circuit held that the officer's statements were not intentional or in reckless disregard of the truth because the defendant failed to raise any evidence to prove the officer

possessed the requisite mental state. *Id.* at 895. In a similar case, the Fifth Circuit emphasized where a defendant failed to raise evidence proving the officer's mental state, despite the fact that some statements in the affidavit were false. *United States v. Looney*, 532 F.3d 392, 395 (5th Cir. 2008). There, the Fifth Circuit deferred to the district court's factual finding that the officer's misstatement was inadvertent error based on the officer's testimony, which the court found to be "forthright," "credible," and demonstrating "honest demeanor on cross examination." *Id.*

Cases from other circuits have also addressed this issue. In a case from the Ninth Circuit, that court found that an officer's explanation in his warrant application of the underlying facts were presented as though he had direct knowledge rather than being informed from another officer's investigation; the court emphasized that the officer could easily have rewritten the facts to acknowledge where he obtained the information but failed to do so, which showed at least reckless disregard of the truth if not intentional misrepresentation. *United States v. Davis*, 714 F.2d 896, 899 (9th Cir. 1983).

In the Tenth Circuit, "[t]o establish reckless disregard in the presentation of information to a magistrate judge, 'there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations . . . and [a] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations.'" *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)). Likewise, in the Eighth Circuit, "[t]he test for determining whether an affiant's statements were made with reckless disregard for the truth is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Butler*, 594 F.3d 955, 961

(8th Cir. 2010); *see also United States v. Wajda*, 810 F.2d 754, 759 (8th Cir. 1987) (stating that a showing of deliberate or reckless falsehood is "not lightly met").

The Court has thoroughly searched for examples of how similarly situated federal courts view typographical errors vis-a-vis the *mens rea* requirement of *Franks*. The conclusion one reaches is that if there is a rule it is that negligent or unintentional typographical errors are not grounds for excising the sentences involved:

- *United States v. Butler*, 594 F.3d 955 (8th Cir. 2010): The officer's application for a search warrant stated two different dates for when a particular controlled buy occurred. The law enforcement reports upon which the affidavit was based indicated which of the dates listed was accurate. The court found that this typographical error did not establish reckless disregard of the truth or cast doubt on the probable cause established for the warrant.
- *United States v. Dates*, No. CR 12-2211 MCA, 2015 WL 13662370 (D.N.M. May 12, 2015): In the officer's application for a search warrant, out of several instances in which he listed the address to be searched, one of the instances incorrectly identified the city in which the address was located. The court found this was a negligent product of using the cut-and-paste function in preparing the affidavit and did not invalidate the search warrant.
- *United States v. McClellan*, 165 F.3d 535 (7th Cir. 1999): In the officer's application for a search warrant, he identified the house address to be searched several times. One of those instances transposed a number in the address, so it was incorrect. The court found that this false statement was inadvertent error and lacked the necessary *mens rea* to invalidate the warrant. The court noted there would be independent grounds for probable cause even if the sentence in question were excised.
- *United States v. Morley*, No. 10-cr-20410, 2010 WL 7380159 (S.D. Fla. Nov. 12, 2010): Here, the officer who wrote the application correctly identified the address to be searched in the application for a search warrant in all but one sentence, where he wrote "2740 NW 177 Terrace" rather than "2740 NW 171 Terrace." The court found that this error in the affidavit did not invalidate the warrant because the officer credibly testified that it was a typographical error, because there was still enough information available to correctly execute the warrant, and because the error was not caught through review by the officer, prosecutor, and magistrate judge.

After a review of all of the facts in light of the decisions from similar cases across the spectrum of federal courts, the Court cannot conclude that Gordon's inclusion of the name "Enzo" rather than "Gero" in the final sentence of the sixth paragraph of his affidavit was made with anything more

than negligence. The presence of a cut-and-paste error—particularly one where the language of the paragraph still suggests the accurate identity of the canine officer and where the affiant presented credible testimony to explain the error—cannot invalidate an otherwise lawful warrant.

Moreover, the cases cited by Beard as justification for his position are inapposite. Beard cites to *Groh v. Ramirez*, 540 U.S. 551 (2004), to support his claim that the mistaken substitution of canine officers was so glaring that "even a cursory reading of the warrant in this case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id.* at 564. However, *Groh* stated this in the context of determining whether police conduct in executing a facially invalid warrant rose was sufficient to establish civil liability in a qualified immunity suit. The standard here—reckless disregard of the truth—is worlds apart from that needed to determine officer liability, which requires that an officer transgressed a clearly established constitutional right in such a way that it should be clear to a reasonable officer that his conduct was unlawful. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Beard also cites to *United States v. Hunt* as support for the argument that where false statements in a warrant application are "not intentionally made to mislead but are material to the establishment of probable cause, the material falsehoods must be excised . . . ." 496 F.2d 888, 894 (5th Cir. 1974). Based upon this quote Beard argues that excision of the sentence in Gordon's affidavit establishing probable cause is required. In *Hunt*, however, the material falsehood referred to whether the affiant actually viewed incriminating evidence at the site to be searched under the warrant. There, the officer claimed in the affidavit that he had seen obscene material at the bookstore at issue when, in fact, he had not seen any such materials when he had visited the bookstore. *Id.* This material falsehood represents a difference in kind, both with regard to the facts

alleged, their importance to the development of probable cause, and the likelihood that the falsehood was accidentally stated. Beard has presented no evidence suggesting that Gordon invented or falsified evidence suggesting criminal activity prior to seeking a warrant rather than negligently preparing the affidavit. Similarly, there is no evidence that "Gero," the actual search dog, was not properly trained, properly handled, or that he did not alert to the package.

Given the case law and circumstances involved in this case, the Court cannot conclude that Gordon acted with reckless disregard for the truth when he failed to cut "Enzo" from his form and add that it was "Gero" who alerted to the package in question. In answer to the guiding inquiry from *Leon*, the issuing judge was not misled by information in the affidavit as presented, as the affidavit clearly indicated that a dog properly trained to detect narcotics alerted to the package, and the typographical error involving that dog's name was not made intentionally or with reckless disregard for the truth. *See Leon*, 468 U.S. at 923. As a result, the Court will not excise the sentence from Gordon's affidavit establishing probable cause. With the sentence demonstrating the dog alert included—the lynchpin of the probable cause inquiry, as described by the Parties—the affidavit sufficiently established probable cause for a search warrant.

### ii. *Bare Bones Affidavit*

Next, the Court turns to the question whether Gordon's affidavit was so "bare bones" as to invalidate the warrant which was based on it. When officers conducting a search rely on a bare bones affidavit, the "lacking in probable cause" exception to good faith is implicated. *United States v. Huerra*, 884 F.3d 511, 515 (5th Cir. 2018). The Fifth Circuit has labeled an affidavit as bare bones "only 'if it is so deficient in demonstrating probable cause that it renders an officer's belief in its existence completely unreasonable.'" *Id.* at 515 (quoting *United States v. Cisneros*, 112 F.3d 1272, 1278 (5th Cir. 1997)). "A 'bare bones' affidavit contains 'wholly conclusory statements,

which lack the facts and circumstances from which a magistrate can independently determine probable cause.'" *United States v. Robinson*, 741 F.3d 588, 597 (5th Cir. 2014) (quoting *Satterwhite*, 980 F.2d at 321); *Huerra*, 884 F.3d at 515 (a bare bones affidavit is one that "merely state[s] that the affiant 'has cause to suspect and does believe' or 'has received reliable information from a credible person and does believe' that contraband is located on the premises"). "Whether an affidavit is a bare bones affidavit is determined by a totality of the circumstances." *Robinson*, 741 F.3d at 597 (citing *United States v. Fisher*, 22 F.3d 574, 578 (5th Cir. 1994).

"'An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). Beard argues that Gordon's affidavit, once boilerplate language and false information are excised, did not contain sufficient information for the magistrate judge to find probable cause, thus invalidating the warrant. In particular, Beard focuses on the fact that Gordon did not mention the ongoing investigation into Beard in order to establish probable cause, that Gordon's assessment that the package may have contained powder (rather than pills) was wrong and not sufficient for probable cause, and that the dog sniff should be ignored entirely because of the misidentification of the canine officer who alerted to narcotics in the parcel. This argument is unavailing. The Court finds that Gordon's affidavit, even with the typographical error, supported the magistrate's finding of probable cause to grant the search warrant.

The only remaining question regarding the bare bones exception, therefore, is whether the officer was reasonable in believing the affidavit supported probable cause. The Fifth Circuit has recently explained that "in analyzing the good-faith exception, however, the question is not whether the affidavit ultimately supported probable cause, but whether the officer applying for the warrant was 'entirely unreasonable' in believing that the affidavit supported probable cause."

*United States v. Gonzales*, No. 18-40229, 2019 WL 1523046, at *3 (5th Cir. Apr. 8, 2019) (quoting *Leon*, 468 U.S. at 923).

In *Gonzales*, a child pornography case, the application for the search warrant contained two errors: It incorrectly identified the date of the search, and it incorrectly identified the I.P. address one out of the eight times that the I.P. address was listed. *Id.* at *1. Like the instant case, those errors went unresolved by the affiant officer, the AUSA who reviewed and submitted the search warrant application, and the magistrate judge who issued the warrant. *Id.* at *3. Had these errors been corrected, the affidavit would support a finding of probable cause. *Id.* The Fifth Circuit held that, given the nature of the errors in the affidavit, it was not "entirely unreasonable" for the officer to "believe the affidavit supported a finding of probable cause because he may reasonably have been unaware of the mistakes in the affidavit." *Id.*

The Court finds no reason to distinguish the instant case from *Gonzales*. Although the affidavit contained an error identifying the wrong canine officer, the affidavit itself was not "bare bones" or filled with "wholly conclusory statements." *See Satterwhite*, 980 F.2d at 321. The paragraph in question indicated five out of six times that the dog involved was "Gero," the canine officer's training, the manner in which the parcel to investigate was seized, and how the decoy test was conducted. Moreover, as in *Gonzales*, the nature of the typographical error was such that it was not "entirely unreasonable" for Gordon to believe his affidavit supported a finding of probable cause. *See Gonzales*, 2019 WL 1523046, at *3; *Leon*, 468 U.S. at 923. The underlying affidavit was not "bare bones" or "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Leon*, 468 U.S. at 923. Accordingly, the Court finds that the good-faith exception applies, and that the Motion to Suppress should not be granted based on an argument that the affidavit was "bare bones."

## IV.  Conclusion

For the reasons given above, **IT IS ORDERED** that Defendant's Motion to Suppress [ECF

No. 24] is **DENIED**.

Signed at Houston, Texas, this ___ day of May, 2019.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE